Julian Burns King (Bar No. 298617)
julian@kingsiegel.com
Elliot J. Siegel (Bar No. 286798)
elliot@kingsiegel.com
**KING & SIEGEL LLP**
724 S. Spring Street, Suite 201
Los Angeles, California 90014
tel:   (213) 465-4802
fax:  (213) 465-4803

Lincoln Ellis, Esq. (SBN 283657)
Lincoln.Lawyer.CA@gmail.com
**LAW OFFICE OF LINCOLN W. ELLIS**
292 S. La Cienega Blvd., Ste. 207
Beverly Hills, CA 90211
Tel: (213) 207-6692
Fax: (855) 701-5136

Attorneys for Plaintiff Fausto Bustos

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Fausto Bustos**, an individual,<br><br>      Plaintiff,<br><br>vs.<br><br>**Royal Bank of Canada**, a corporation; **City National Bank**, a corporation; and **Does 1-10**, inclusive,<br><br>      Defendants. | CASE NO.<br><br>**COMPLAINT FOR:**<br><br>1) **Retaliation in Violation of the Sarbanes-Oxley Act (18 U.S.C. § 1514A)**<br><br>**Demand for Jury Trial** |

COMPLAINT

Plaintiff Fausto ( Joseph) Bustos, by and through his attorneys, hereby complains and alleges as follows:

## **INTRODUCTION**

1.      Plaintiff Fausto ( Joseph) Bustos is a veteran and successful programmer and project manager who thrived in his role as a Vice President and later as a Senior Vice President at defendant City National Bank ("CNB"), a wholly-owned subsidiary of defendant Royal Bank of Canada ("RBC"), (collectively "Defendants" or "the Bank"). He received uniformly positive performance reviews and feedback for his work throughout his employment.

2.      In or around 2018, City National reorganized its digital technology departments. The resulting organization lacked effective internal controls, clear lines of oversight, and enabled personnel to bypass Bank policy and federal regulations designed to ensure the accuracy of SEC filings and financial disclosures. For instance, he observed significant accounting errors relating to software development projects, including errors that would inflate the amount of assets on the Bank's balance sheets and allow the Bank to claim tax benefits and/or overstate its profits. Mr. Bustos recognized this as a significant lapse in financial controls that posed significant risk to CNB and, by extension, to RBC.

3.      Mr. Bustos repeatedly complained both orally and in writing about these misallocations and their effect on the accuracy of the Bank's balance sheets and financial reports, including to the Royal Bank of Canada's internal auditors, City National's head of Human Resources, and City National's Vice President of Corporate Security, among others.

4.      City National investigated Mr. Bustos's allegations and identified approximately $5.4 million in misallocated invoices, vindicating Mr. Bustos's complaints. The Bank issued a memorandum reminding employees about its account policies and procedures, including for reporting costs as capital expenses. Around the same time, Royal Bank of Canada's internal auditors gave poor marks to City National's internal controls,

1   noting that they needed improvement—consistent with Mr. Bustos's complaints.

2       5.    Mr. Bustos's superiors at City National resented Mr. Bustos and his

3   team's involvement in calling attention to their deficiencies and misconduct. The Bank

4   devised a layoff scheme to get rid of Mr. Bustos, calling a "*highly confidential*" meeting

5   about "*resource planning*," specifically, "*recruitment needs on Greg's team (w/ Mgmt*

6   *roles)*."

7       6.    Within weeks, Mr. Bustos and several lower-level employees had been

8   fired because of a supposed reorganization. This was false: their positions were soon

9   advertised on hiring websites, and the Bank had always intended to replace them, as

10  evidenced by the email regarding "*recruitment needs.*"

11      7.    In reality, Mr. Bustos was fired because he complained about City Na-

12  tional's lax internal controls, accounting misconduct, and possible tax fraud.

13  **PARTIES**

14      8.    Plaintiff **Fausto ( Joseph) Bustos** was a resident of California at all times

15  relevant to this complaint. Mr. Bustos served in the United States Army from 1987

16  through 1999, culminating with an assignment within Special Forces as a Special Op-

17  erations Communications Operator, in which he was responsible for managing commu-

18  nications technologies. After his honorable discharge, Mr. Bustos worked as an IT

19  Manager and Consultant for large companies from 1999 until 2015 and even taught as

20  an adjunct professor of computer programming at California State Polytechnic Univer-

21  sity – Pomona from 2003 through 2007. He was employed by Defendants as Senior

22  Vice President of Digital Solutions, Analytics, and Performance from August 2015 to

23  August 21, 2019. At all times while working for Defendants, he worked at Defendants'

24  corporate office in downtown Los Angeles.

25      9.    Defendant **Royal Bank of Canada** is a publicly traded banking corpora-

26  tion with corporate headquarters located in Toronto, Ontario in Canada. Defendant

27  RBC is traded on the New York Stock Exchange under the ticker symbol "RY." RBC

28  files audited financial statements and other regulatorily-mandated public filings with

2
Complaint

1 the SEC. RBC operates in California through defendant City National Bank.

2       10.    Defendant **City National Bank** is a banking corporation. Defendant RBC

3 agreed to acquire CNB in 2014 and closed the transaction in 2015. At all times during

4 Mr. Bustos' employment at CNB, CNB was a subsidiary of defendant RBC, and CNB's

5 financial statements were reflected in the audited financial statements of RBC as filed

6 with the SEC. City National Bank is headquartered and has a principal place of business

7 at 555 S. Flower Street, 18th Floor, Los Angeles, CA 90071.

8       11.    Plaintiff does not currently know the names and true identities of **Does 1-**

9 **10**. Plaintiff reserves the right to amend this complaint to show their true names and

10 capacities when this information is ascertained. Each Doe defendant is responsible for

11 the damages alleged pursuant to each of the causes of action asserted, either through

12 its own conduct, or vicariously through the conduct of others. All further references in

13 this complaint to any of the named Defendants includes the fictitiously named defend-

14 ants.

15       12.    At all times alleged in the complaint, each Defendant was an agent, serv-

16 ant, employee, partner, joint employer, integrated enterprise, and/or joint venture of

17 every other Defendant and was acting within the scope of that relationship with each

18 of the other Defendants. Moreover, the conduct of every Defendant was ratified by

19 each other Defendant.

20       **VENUE AND JURISDICTION**

21       13.    This Court has jurisdiction over this dispute pursuant to 18 U.S.C.

22 § 1514A, *et seq.*, and 28 U.S.C. § 1331, as well as section 806 of the Sarbanes-Oxley Act

23 of 2002, which creates a private right of action for employees who experience retalia-

24 tion who engage in protected activity relating to a publicly traded company.

25       14.    Venue is proper in this district under 28 U.S.C. § 1391(a) because the acts

26 that give rise to the complaint, as well as certain acts that violate federal securities laws

27 or rules promulgated by the SEC, took place in this district. Mr. Bustos was employed

28 in this district and worked at Defendants' in downtown Los Angeles. A substantial part

1 of the events or omissions giving rise to the claim occurred in this district.

2     15.    Mr. Bustos timely filed a complaint with the United States Department of

3 Labor ("DOL"). More than 180 days have elapsed since that complaint was filed, and

4 no decision has been issued by the DOL to date. Mr. Bustos therefore has exhausted

5 his administrative remedies.

## FACTS

### Background

8     16.    Mr. Bustos was working for approximately two and a half years as a Direc-

9 tor of Software Development & Enterprise Architecture for The Word & Brown Com-

10 panies when he received a cold call from a recruiter about a position at CNB. Mr.

11 Bustos was drawn to the proximity to his home, the possibility of upward mobility, and

12 the more robust benefit package offered by CNB and decided to apply for the position.

13     17.    Mr. Bustos was hired as a Vice President of Digital Development Services

14 Lead with the Bank's Business and Technology Services (BATS) division beginning in

15 August 2015. In this role, he was responsible for overseeing the Bank's portfolio of dig-

16 ital applications and managing the various project teams and contractors that devel-

17 oped them.

### Mr. Bustos Is a Strong Performer for the Bank

19     18.    Mr. Bustos excelled and his imprint on the Bank was felt immediately. At

20 the end of 2015, after just over four months of work, his supervisors commended him

21 as a "*strong manager that drives commitments from his teams and resources*" by "*mini-*

22 *miz[ing] and nearly eliminat[ing] distractions and ensur[ing] that his teams and resources*

23 *keep their focus on capital efforts.*" His 2015 performance review further noted that he

24 was "*singlehanded[ly]*" responsible for overseeing a vendor in a critical project for the

25 Bank's digital infrastructure.

26     19.    Mr. Bustos's performance was so strong that, in or around November

27 2017, Mr. Bustos was promoted to Senior Vice President and was entrusted with addi-

28 tional job duties and oversight responsibilities. (To be selected for this promotion, Mr.

Bustos was required to demonstrate "*both* individual and career achievements and effective leadership," to have "consistent 'above average' performance" and have been endorsed for the position by an Executive Vice President of the Bank.)

20. Mr. Bustos was so dedicated to the Bank that he regularly invested his spare time in the Bank's community. For instance, he was the Chair of the Veteran Community and was active in an affinity group for the Bank's Latinx workers. He also volunteered with the Bank's charitable initiatives and formal mentoring programs.

21. He was, in all respects, a model employee who planned to retire after a long career at CNB.

**Background on Accounting for Expenses**

**Versus Capital Expenditures in Software Development**

22. Under Generally Accepted Accounting Principles ("GAAP") guidelines, expenses are typically categorized into operating, financing, or capital expenses. Operating expenses are those that provide benefits in the quarter in which they are booked—for example, the cost of purchasing parts for production of a good—and are immediately taken as deductions under cash accrual accounting. Capital expenses—typically things like buying land or buildings—are essentially converted into an asset that, in subsequent accounting periods, can depreciate and provide tax benefits to the company. The same is not true for operating expenses, which do not provide ongoing tax benefits for the corporation.

23. This distinction is important because, while capitalized costs can be amortized year over year, other costs must be realized in the year they are incurred—meaning that Defendants' balance sheets would *underreport* the true balance of accounts if operating expenses were mischaracterized as capital expenses.

24. In general, software under development should be accounted for as a capital expense until it is technologically feasible but not yet available for sale. Like other capital expenses, software development costs that are classified as capital expenses ver-

sus operational expenses may be amortized over time, resulting in lower reported expenses and thus higher net income.

25.     The Sarbanes-Oxley Act expressly recognizes that internal controls are necessary to ensure the accuracy of financial statements that are relied on by investors and the broader market. For example, the Act requires officers who sign quarterly or annual reports with the SEC to certify that internal controls exist to ensure that material information is known to the signing officers and that the signing officers have evaluated the effectiveness of the internal controls within 90 days of signing the report. *See* 15 U.S.C. § 7241(a).

26.     Sarbanes-Oxley was intended to restore (1) public faith in the financial reporting issued by publicly traded companies and (2) investor confidence in the metrics used to evaluate a company's performance. To that end, Section 404 of Sarbanes-Oxley expressly concerns "Management Assessment of Internal Controls" and sets forth numerous requirements as to internal accounting controls and procedures for any financial reporting that is an input in the company's financial statements. Indeed, Sarbanes-Oxley's drafters were so concerned about the accuracy of financial reports and the strength of internal controls that they enacted *individual liability* for corporate executives who certified the accuracy of financial statements that were found to violate applicable rules or regulations.

**The Bank Folds MAPS into BATS and**

**Enables Lax Internal Controls Over Cost Accounting**

27.     During the course of 2016 as part of an organizational realignment, Defendants' BATS Digital Technologies department merged Mr. Bustos and several other BATS employees into the Marketing and Product Strategies (MAPS) division's Digital Channels department. Mr. Bustos maintained his role and took on additional supervisory responsibilities.

28.     In 2018, the Bank changed course and folded MAPS back into the BATS division. Only Mr. Bustos, who was supervising creation of new data analytics software,

1    remained in the MAPS division. At the same time, the Bank transitioned from manual

2    invoice processing for software development teams to automated invoice processing.

3         29.    The switch to automated invoice processing, without a corresponding in-

4    crease in internal controls, made room for personnel to manipulate billing and invoic-

5    ing. Although MAPS continued to oversee the digital program and budget planning,

6    BATS managers began to charge project development costs for their projects to pro-

7    jects under Mr. Bustos's supervision, in violation of Bank policy.

8         30.    Mr. Bustos repeatedly complained about lax internal controls and ac-

9    counting errors that inhibited his ability to effectively oversee his projects and impeded

10   the Bank's ability to rely on its internal accounting.

11        31.    For example, in June 2018, BATS senior managers directed a vendor to

12   send contractor timesheets and invoices to BATS, instead of  Mr. Bustos, for ap-

13   proval—even though Mr. Bustos was the senior manager ultimately responsible for the

14   vendor's work—in violation of the Bank's formal policies and internal controls. This

15   meant that Mr. Bustos did not have oversight over whether expenses for projects under

16   his supervision were being properly accounted for—and, by extension, the Bank also

17   could not rely on its internal accounting of project expenses. Mr. Bustos complained to

18   his supervisor and to a representative of Human Resources about his inability to accu-

19   rately supervise his project budgets.

20        32.    Around this time, Mr. Bustos also audited budgets and invoices on certain

21   projects and learned that there were significant discrepancies that should be addressed.

22   He raised these concerns with the individuals at the Bank who were responsible for

23   invoicing.

24        33.    By Fall 2018, it came to Mr. Bustos' attention that the BATS team had

25   categorized certain MAPS project costs as capital expenses rather than operational

26   costs. This allowed the Bank to claim the expenses as *assets*, even though no viable

27   software existed, and depreciate the expenses in the future—thus inflating assets on

28

the Bank's balance sheets and obtaining tax benefits to which the Bank may not be entitled. Mr. Bustos recognized this as a significant lapse in financial controls that posed significant risk to CNB and, by extension, to RBC.

34.     Mr. Bustos investigated these misallocations by directing his contractor, Joyce Reyes, to review the MAPS portfolio and identify possible cost misallocations. Ms. Reyes's audit identified numerous misallocations of expenses, which Mr. Bustos then provided to his supervisor in an effort to encourage the Bank to solve these accounting problems.

35.     These challenges did not derail Mr. Bustos' from maintaining his characteristically strong performance. Indeed, on January 8, 2019, he was rated as exceeding expectations and his superiors commended him for "*always rall[ying] to adapt to the changes*" to his role. His supervisor thought he had a bright future at the Bank: "*Joe has much to contribute to the organization as a whole as we expand our capabilities. I look forward to his leadership in helping us establish and normalize our Digital Analytics and Performance monitoring capabilities.*"

**Mr. Bustos Repeatedly Sounds the Alarm on**

**Accounting and Tax Fraud Throughout 2019**

36.     In February 2019, just a month after his positive performance review that looked towards a strong future at the Bank, Mr. Bustos was called to meet with an RBC auditor, Robert Pexa, and supervisors from CNB for an annual audit review of the Bank's Digital Technologies portfolios. Mr. Bustos cooperated fully and candidly with the RBC auditors, disclosing that a lack of internal controls in accounting had made it challenging to ensure that his own accounting records were accurate.

37.     Shortly after this meeting, Mr. Bustos was called to meet with Jamie Doss of Human Resources and Tom Reynolds, the Vice President of Corporate Security, and was presented with accusations that he misappropriated funds from MAPS projects. (A later investigation would show that these allegations were baseless and "perhaps

retaliatory" towards Mr. Bustos raising complaints about BATS personnel's account-ing misconduct.)

38.     Mr. Bustos cooperated fully with this investigation and explained that he had uncovered significant accounting errors and lax internal controls with respect to the Bank's projects. He provided written evidence that BATS senior managers were ignoring written policies designed to ensure accurate accounting. He also posed, in writing, critical questions about CNB's internal controls and tax practices: "*Identify what record keeping systems track invoices and expenditures. What process is used to allocate funds? What process is used to categorize a cost?*"

39.     The Bank's Corporate Security group, then led by Tom Reynolds, inves-tigated invoice anomalies in the MAPS Digital Channels department. As Mr. Bustos had noted, the Bank found an increasing number of invoices being misallocated to dif-ferent projects and identified a significant number of invoices that had been booked as capital expenses rather than operating expenses, thus artificially inflating the Bank's assets on its balance sheets.

40.     Corporate Security summarized these findings in a presentation in March 2019. In addition to showing increasing amounts of misallocated invoices over the course of 2018 and 2019, the presentation *expressly* noted that CNB's Controller was "*responsible for processing invoices*," but did *nothing* to determine whether an invoice should be "*capitalized or expensed*." The presentation recommended "*creat[ing] [an] independent accounting unit to handle invoicing and receivables*" and conducting "*third line review to validate integrity and results of divisional review*."

41.     On information and belief, CNB's investigation identified approximately *$5.7 million* in accounting irregularities attributable to the MAPS portfolio alone.

42.     Following the investigation, CNB also circulated a memorandum about its accounting policies and the procedures for reporting costs as capital expenses.

**Mr. Bustos Continues to Complain About Accounting Practices**

**and Allocation of Capital Expenses**

43.     Unfortunately, CNB's belated attempts to resolve its obvious accounting deficiencies did not solve the problem, as little was done to train employees and many of the investigation's recommendations were disregarded.

44.     Throughout late Spring and Summer 2019, Mr. Bustos continued to complain that his counterpart in BATS, Hugh Westermeyer, was charging BATS costs to MAPS projects without his knowledge or permission, leaving Mr. Bustos without an understanding of whether the costs could be classified as capital expenses.

45.     This led to continuous conflict between Mr. Westermeyer and Mr. Bustos. In early Summer 2019, Mr. Bustos attended a conference call with Mr. Westermeyer and others to discuss CNB's policy regarding digital costs accounting. Mr. Bustos told Mr. Westermeyer that he believed certain allocations were "*fraudulent*"—that they were being charged as capital expenses but were actually operational expenses.[1]

46.     Around the same time, RBC's internal auditors issued a report stating that CNB's BATS Digital Technologies division's internal controls "*Require[d] Improvement*."

47.     CNB resented Mr. Bustos's involvement in drawing attention to these deficiencies.

48.     Unbeknownst to him, CNB plotted to oust him around this time. Beginning in late July 2019, Jamie Doss, Linda Duncombe, Greg Smith, Cindi Scribner, and Patrick McCarthy held a "*highly confidential*" meeting about "*resource planning*," specifically, "*recruitment needs on Greg's team (w/ Mgmt roles)*."

**Mr. Bustos is Terminated**

49.     On August 19, 2019, Mr. Bustos met with Greg Smith, the Senior VP of

---

[1] In or around July 2019, RBC's internal auditors issued a report stating that CNB's BATS Digital Technologies division's internal controls "*Require[d] Improvement*." CNB resented Mr. Bustos's involvement in drawing attention to these deficiencies.

Digital Channels & Innovation, who informed him that Mr. Reynolds of Corporate Security was coming up with a "*solution*" to Mr. Bustos's ongoing problems with the BATS team. Mr. Smith asked Mr. Bustos what "*solution*" Mr. Reynolds was referring to, but Mr. Smith claimed not to know.

50.   This was the first Mr. Bustos heard of the "*solution*" to the MAPS team's ongoing accounting malfeasance, but he was not in the dark for long.

51.   On August 21, 2019, Mr. Bustos was abruptly terminated. The Bank claimed to be conducting a "reduction in force," but Mr. Bustos was the only employee at his level to be terminated, and numerous employees who were involved in the misconduct were retained. Moreover, various positions within MAPS—including one very similar to Mr. Bustos's position—were advertised on public job sites shortly after the alleged "reduction in force."

52.   In reality, the Bank "reorganized" its MAPS digital channels department to eliminate Mr. Bustos's role and replace him with someone who had not complained of misconduct, lax accounting practices, and fraud.

**Mr. Bustos Files a Complaint with OSHA Under the Sarbanes-Oxley Act**

53.   On February 2, 2020, Mr. Bustos, through his counsel, filed a complaint of retaliation with the DOL's Occupational Safety and Health Administration ("OSHA") as required by the Sarbanes-Oxley Act. To date, more than 180 days have elapsed since Mr. Bustos' administrative complaint, but OSHA has not issued a final decision.  Thus, Mr. Bustos may proceed to file this case in federal district court, and any arbitration agreement would be void. 18 U.S.C. § 1514A(b)(1); 1514A(e).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the Sarbanes-Oxley Act

### 18 U.S.C. § 1514A

### (Plaintiff Against Defendants)

54.   Plaintiff repeats and incorporates by reference all allegations contained in

11

COMPLAINT

the preceding paragraphs as if fully set forth herein.

55.     At all times relevant to this complaint, Defendants were covered entities under the Sarbanes-Oxley Act of 2002, including pursuant to 18 U.S.C. § 1514A.

56.     Plaintiff was an employee of a covered entity within the meaning of Sarbanes-Oxley.

57.     Defendants violated the Sarbanes-Oxley Act by, without limitation, retaliating against Plaintiff for making internal complaints of illegal conduct. Defendants ultimately terminated Mr. Bustos because of his protected internal complaints.

58.     As a proximate result Defendants' conduct, Plaintiff has suffered and will continue to suffer severe financial, mental, and emotional hardship and injury including lost compensation, lost benefits, reduced possibilities for equivalent future earnings. As further direct and proximate results of Defendants' conduct, Plaintiff continues to suffer damages in the form of lost future earnings, benefits, and/or other prospective damages in an amount to be proven at trial.

59.     Because of the conduct alleged herein, Plaintiff hired attorneys to prosecute his claims under the Sarbanes-Oxley Act. Accordingly, Plaintiff is entitled to recover attorneys' fees and costs in addition to other damages provided by law.

60.     Moreover, Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for Plaintiff's rights, entitling him to punitive damages.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays judgment as follows:

A.     Back pay (lost wages and benefits);

B.     Injunctive Relief in the form of reinstatement with the same seniority he would have if not for the retaliation, or front pay in lieu thereof;

C.     Special damages for impairment of reputation, personal humiliation,

mental anguish and suffering, other noneconomic harm resulting from the retaliation, and other special damages as permitted by law;

        D.    Attorneys' fees and costs of suit; and

        E.    For such other relief as this Court deems just and proper.

Dated:      June 15, 2021              Respectfully submitted,

                                      **KING & SIEGEL LLP**

                                      By: _Julian Burns King_
                                      Julian Burns King
                                      Attorneys for Plaintiff